IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CARNIVAL CORPORATION, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CA 13-0314-CG-C |
| | * | |
| BAE SYSTEMS SSY ALABAMA | * | |
| PROPERTY HOLDINGS, LLC., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |
| SIGNAL SHIP REPAIR, LLC, | * | |
| | * | |
| Counter- and Cross-Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| CARNIVAL CORPORATION, BAE | * | |
| SYSTEMS SSY ALABAMA PROPERTY | * | |
| HOLDINGS, LLC, BAE SYSTEMS | * | |
| SOUTHEAST SHIPYARDS ALABAMA | * | |
| LLC, *in personam*, and M/V CARNIVAL | * | |
| TRIUMPH, her engines, tackle, gear, | * | |
| appurtenances, and all accessories thereto, | * | |
| *in rem,* | * | |
| | * | |
| Counter- or Cross-Defendants. | * | |
| | * | |
| AND | * | |
| | * | |
| BERNADETTE W. JOHNSON, etc., | * | |
| et al., | * | |
| | * | CA 13-0330-CG-C |
| Plaintiffs, | * | |
| | * | |
| vs. | * | |
| | * | |
| CARNIVAL CORPORATION, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

UNITED STATES OF AMERICA,    *
    *
    Plaintiff,    *
    *    CA 13-0472-CG-C
vs.    *
    *
CARNIVAL CORPORATION; BAE    *
SYSTEMS SSY ALABAMA PROPERTY    *
HOLDINGS, LLC; BAE SYSTEMS    *
SOUTHEAST SHIPYARDS ALABAMA    *
LLC, *in personam;* and M/V CARNIVAL    *
TRIUMPH, her engines, tackle, gear,    *
appurtenances, and all accessories thereto,    *
*in rem,*    *
    *
    Defendants.    *
    *

## BAE SYSTEMS SOUTHEAST SHIPYARDS ALABAMA LLC'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant BAE Systems Southeast Shipyards Alabama LLC ("BAE Shipyards"), pursuant to Local Rule 7.2(a), respectfully submits this brief in support of its motion for partial summary judgment.  BAE Shipyards is entitled to partial summary judgment on the following grounds: (1) The limitation of liability clause in the February 17, 2013 contract between BAE Shipyards and Carnival Corporation ("Carnival") is enforceable, such that BAE Shipyards' liability to Carnival, if any, arising out of the breakaway incident made the subject of this action, is limited to $1 million; and (2) BAE Shipyards is immune pursuant to the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq*. (the "Act") to Carnival's claims for indemnification and contribution relating to the alleged injuries of Jason Alexander Ewing and death of John R. "Buster" Johnson,

both of whom were longshoremen and employees of BAE Shipyards.[1]  As to these two grounds, there is no genuine issue of material fact, and BAE Shipyards is entitled to judgment as a matter of law.

## STATEMENT OF UNDISPUTED FACTS

### BAE Shipyards' Background.

1.      BAE Shipyards operates a shipyard in Mobile County, Alabama on the east side of the Mobile River.  (Aff. of Victor S. Rhoades, at ¶ 4, attached hereto as "Exhibit A").  At this shipyard, BAE Shipyards performs repair and conversion work on ships, including commercial fleets, cruise ships, and vessels that serve the United States defense cargo market.  (*Id.*)  As part of its operation at this shipyard, BAE Shipyards operates dry docks and several piers, including Piers J and K, where the repair and conversion work is performed.  (*Id.*)

2.      BAE Shipyards employs approximately 540 workers.  Approximately 400 workers are directly engaged in longshore positions in the shipyard, performing ship repair work and the construction of new vessels.  These positions include, but are not limited to positions such as riggers, painters, pipefitters, machinists, carpenters, and electricians.  (Ex. A, ¶ 5).

---

[1] Carnival has filed a motion to for leave to amend its complaint to add two defendants.  (Doc. 130).  The proposed Amended Complaint does not alter the claims against BAE Shipyards. Therefore, this motion for partial summary judgment applies equally to the claims asserted against BAE Shipyards in Carnival's proposed Amended Complaint.

3.     BAE Shipyards maintains United States Longshore and Harbor Workers Compensation Act ("LHWCA") insurance coverage.  (Ex. A, ¶ 6).

4.     At all pertinent times, John R. "Buster" Johnson and Jason Alexander Ewing were BAE Shipyards' employees.  (Ex. A, ¶ 7).  Johnson started work for BAE Shipyards' predecessor on or around November 19, 1997, and worked for BAE Shipyards through the date of his fatal accident.  (*Id.*).  Ewing started work for BAE Shipyards on or around July 12, 2012, and last worked for BAE Shipyards on January 1, 2014.  (*Id.*).

5.     During their employment with BAE Shipyards, Johnson and Ewing worked as Riggers (1st class).  (Aff. of Randall Jordan, at ¶ 4, attached hereto as "Exhibit B"; Ex. C, Ewing Responses to Carnival's First Interrogatories, No. 3; Ex. D, Johnson Responses to Carnival's First Interrogatories, No. 4).  Riggers, like Johnson and Ewing, are responsible for "rigging up" materials for cranes to hoist.  (Ex. B, ¶ 4; Ex. C, Ewing Responses to Carnival's First Interrogatories, No. 3).  They also operate forklifts to move materials onto and off of vessels, such as the TRIUMPH.    (Ex.  B,  ¶  4;  Ex.  C,  Ewing  Responses  to  Carnival's  First Interrogatories,  No.  3;  Ex.  D,  Johnson  Responses  to  Carnival's  First Interrogatories,  No. 4).  As Riggers, Johnson and Ewing worked in the shipyard and performed these tasks to support the repair work and services provided to the vessels.  (Ex. B, ¶ 4).

***Carnival's Background***.

6.      Carnival is a global cruise company.  (Ex. E, Dep. of Jan-Erik Pedersen, 29:19-21; Ex. F, Carnival website).  It operates cruise ships around the world.  (Ex. E, Pedersen, 29:22-30:1).  Carnival owns approximately 102 ships. (Ex. G, Carnival website; Ex. H, Dep. of Gaetano Gigliotti, 309:19-310:10).[2]  At all pertinent times, Carnival was the owner of the M/V CARNIVAL TRIUMPH (the "TRIUMPH").  (Docs. 1, ¶ 4; 75).

7.      Carnival is headquartered in Miami, Florida and London, England. (Ex. G, Carnival website; Ex, H, Gigliotti, 308:12-15).  Carnival's stock is listed on the New York Stock Exchange and the London Stock Exchange.  (Ex. E, Pedersen, 33:12-15; Ex. H, Gigliotti, 310:17-20).

8.      Carnival's portfolio of cruise brands includes a number of cruise lines: Carnival Cruise Lines, Holland America Lines, Princess Cruises, and Seabourn in North America; P&O Cruises and Cunard in the United Kingdom; AIDA Cruises in Germany; Costa Cruises in Southern Europe; Iberocruceros in Spain; and P&O Cruises in Australia.  (Ex. E, Pedersen, 30:7-31:11; Ex. F, Carnival website; Ex. H, Gigliotti, 309:5-14).  (Hereafter, Carnival and its cruise brands will be referred to collectively as "Carnival").

---

[2] Gaetano Gigliotti is employed by Carnival as Vice-President of Maritime Quality Assurance.  (Ex. H, Gigliotti, 13:21-24; 44:16-18; 212:13-15).

9.      Jan-Erik Pedersen is a fleet director and director of technical operations for Carnival.  (Ex. E, Pedersen, 16:16-17:6).  At all pertinent times, Pedersen reported to Martin Landtman, Carnival's senior vice president.  (Ex. E, Pedersen, 19:5-10).

*Carnival's Experience with Shipyards.*

10.     Carnival has its ships repaired and serviced in shipyards around the country and, in fact, around the world.  (Ex. E, Pedersen, 52:21-53:4).  Carnival also owns an interest in at least one shipyard – the Grand Bahama Shipyard in Freeport, Bahamas.  (Ex. E, Pedersen, 42:1-11).

11.     Carnival regularly reviews and negotiates contracts with shipyards. (Ex. E, Pedersen, 54:2-9).  Carnival is "no stranger to shipyard contracts" and "no stranger to negotiating with shipyards in terms of contracts."  (Ex. E, Pedersen, 54:10-17).  In fact, Carnival "is experienced in negotiating contracts with shipyards and entering into contracts with shipyards."  (Ex. E, Pedersen, 55:20-56:1).  When its ships are repaired or serviced at Grand Bahama Shipyard, Carnival enters into contracts in the same manner it does with any other commercial shipyard.  (Ex. E, Pedersen, 237:18-238:1).

12.     Carnival's need for shipyards to perform repairs and services will continue into the future as long as Carnival owns ships.  (Ex. E, Pedersen, 55:12-16).

13.     Carnival has legal departments with in-house lawyers.  (Ex. E, Pedersen, 43:7-44:4; Ex. H, Gigliotti, 311:17-312:5).  Carnival employees, like Pedersen, have access to the legal departments for advice and support as necessary in performing their work.  (Ex. E, Pedersen, 43:21-44:15).

14.     Carnival also has outside counsel to assist in legal matters.  (Ex. E, Pedersen, 44:16-45:12).

15.     As part of his job duties, Pederson is involved with negotiations of ship-repair contracts.  (Ex. E, Pedersen, 56:12-16).  If there is something in a ship repair contract that is beyond Pedersen's scope of experience or expertise, then his practice is to call upon either his supervisors or the in-house lawyers for Carnival.  (Ex. E, Pedersen, 56:17-21).  Pedersen has those resources "available to [him] at all times."  (Ex. E, Pedersen, 56:22-57:1).

16.     If Pedersen ever received a contract that he was uncertain about, he has "a team of lawyers from Carnival who could review it for [him] and provide [him] with advice."  (Ex. E, Pedersen, 57:2-8).  In his words, all he "had to do was ask them."  (Ex. E, Pedersen, 57:9-11).

17.     Carnival has worked with BAE Shipyards in Mobile and BAE Shipyards' predecessors, Atlantic Marine Alabama, LLC and Atlantic Marine, Inc., in the past.  (Ex. E, Pedersen, 58:11-16). Carnival and BAE Shipyards have "had a long-standing business relationship" that Pedersen describes as "a good business

relationship." (Ex. E, Pedersen, 61:12-20; 63:3-5). At least one of Carnival's ships (the M/V CELEBRATION) has previously gone to BAE Shipyards for routine dry docking and for certain repairs and services after a fire. (Ex. E, Pedersen, 61:17-20; Ex. I, Email).

18. Pedersen has personally been involved with Carnival's prior work at BAE Shipyards in Mobile. (Ex. E, Pedersen, 58:17-59:2). Pedersen has also been involved with repair work or service that BAE Shipyards in San Francisco provided to Carnival, most recently with regard to a fire on a Carnival ship similar to that experienced by the TRIUMPH. (Ex. E, Pedersen, 59:19-60:9). In total, Pedersen has personally been involved in seven jobs with BAE Shipyards in Mobile or San Francisco, though Carnival has been involved in a number of others with BAE Shipyards that did not involve Pedersen. (Ex. E, Pedersen, 60:15-61:11; 62:20-63:2).

19. It is Pedersen's impression that Carnival was a good client to BAE Shipyards and that BAE Shipyards had every incentive to deal with Carnival fairly and honestly. (Ex. E, Pedersen, 63:8-14).

20. Pedersen knows employees of BAE Shipyards, including Tom Godfrey. (Ex. E, Pedersen, 61:21-62:4). Pedersen has known Godfrey professionally "for quite some time" (Ex. E, Pedersen, 74:15-19), and Pedersen has worked with Godfrey on several occasions. (Ex. E, Pedersen, 63:20-23).

Godfrey would come to see Pedersen in the office, contact him many times, and see Pedersen at least once a year at the Sea Trade Exhibition in Miami. (Ex. E, Pedersen, 63:20-64:5). Pedersen has Godfrey's cell number and office number in his contacts list. (Ex. E, Pedersen, 111:4-10).

21.     Based on Pedersen's dealings with Godfrey, Pedersen considers Godfrey to be an honest, trustworthy person and a man of his word. (Ex. E, Pedersen, 63:20-5). Godfrey was always fair and honest with Pedersen. (Ex. E, Pedersen, 64:18-22). Godfrey is "the type of person [Pedersen] would like to deal with again in the future." (Ex. E, Pedersen, 102:13-16).

22.     In addition to Godfrey, Pedersen dealt with Howard Knepton, a Project Manager at BAE Shipyards. (Ex. E, Pedersen, 92:1-15). Like Godfrey, Pederson considered Knepton to be an honest, trustworthy person based on their dealings. (Ex. E, Pedersen, 102:2-9). Also, like Godfrey, Knepton is "the type of person [Pedersen] would like to deal with again in the future." (Ex. E, Pedersen, 102:10-12).

### The Contract.

23.     The TRIUMPH experienced a fire on February 10, 2013. (Ex. E, Pedersen, 49:21-50:3). The fire caused the TRIUMPH to lose propulsion and power, making it a "dead ship" at sea. (Ex. J, Dep. of Captain Angelo Los, 127:6-19).

24.     On February 11, 2013, Godfrey emailed Pedersen.   (Ex. K, Email). In the email, Godfrey reached out to Pederson, saying, "I just wanted to offer you our services here in Mobile for the TRIUMPH if you need a place to bring the vessel." (*Id.*).[3]

25.     Carnival could have towed the TRIUMPH to its home port of Galveston, but Carnival determined that it would take too long because it was too far away.   (Ex. E, Pedersen, 85:13-86:10; 89:19-22).   Carnival also considered Progresso, Mexico because it was the closest port.  (Ex. E, Pedersen, 80:11-16).

26.     Based on the direction of the current, however, Carnival decided that the best option would be to take the ship directly to Mobile.  (Ex. E, Pedersen, 80:11-81:15).   Pedersen was involved in the decision to tow the TRIUMPH to Mobile.  (Ex. E, Pedersen, 79:23-80:4).

27.     Carnival decided to unload guests and crew at the Mobile Cruise Terminal and then tow the TRIUMPH to BAE Shipyards Mobile facility for repair. (Ex. M, Email).[4]

---

[3] Carnival was discussing towing the TRIUMPH to Galveston, Progresso, Mexico, or Mobile.  (Ex. L, Email). Pedersen testified that he "probably" discussed with Godfrey where Carnival considered towing the TRIUMPH, but he could not recall.  (Ex. E, Pedersen, 113:17-114:12).   In an email, Godfrey asked Pedersen, "If you tow to Galveston or Progresso, could the vessel proceed to our yard after the offload of passengers?"  (Ex. I, Email).
[4] BAE Shipyards was not the only facility in Mobile where the repair work and services could have been performed and provided.  The repair work and services also could have been performed and provided at the Mobile Cruise Terminal pier or one of the piers at the Alabama State Docks. (Ex. N, Dep. of Howard Knepton 103:19-104:18, 105:18-24).   In fact, after the April 3 breakaway incident, the TRIUMPH was moored at the Alabama Cruise Terminal where the repairs were performed through May 8 when the TRIUMPH departed the Port of Mobile and headed to the Grand Bahama Shipyard for dry docking and further repairs.  (Ex. N, Knepton, 104:4-13).

28.     When that decision was made, on February 12, 2013, Godfrey emailed Pedersen and another Carnival employee (M. Haines) to request Carnival's proposed contract with BAE Shipyards:  "Can you send your contract ASAP[,] so I can get it reviewed[?]  If it is similar to the San Francisco Contract, we should be able to review it quickly."  (Ex. O, Email).

29.     Although Godfrey asked Pedersen to send Carnival's contract for review, Pedersen did not send him a proposed contract.  (Ex. E, Pedersen, 131:20-132:4; 133:5-8; 137:8-12).

30.     Godfrey reached out to Pedersen a second time to ask for Carnival's proposed contract, stating, "[S]end me the San Francisco Contract in Word format if available so that we can get it modified for this availability."  (Ex. P, Email; Ex. E, Pedersen, 155:15-23).  Still, Pedersen never sent Godfrey a proposed contract. (Ex. E, Pedersen, 156:1-14).

31.     On February 13, 2013, Godfrey emailed Pedersen two proposed contracts, including one entitled "Exhibit A" which contained certain Terms, Conditions, and Provisions (the "Contract").  (Ex. Q, Email).  In his email, Godfrey stated:

> We will need to have these documents signed in order to start work.  Please forward them to the appropriate people in your organization.  We can start work under these documents and then transition to a mutually agreed contract within the next few weeks.

(*Id.*).  Pedersen acknowledged that he could have forwarded this email (or had it forwarded on his behalf) to anyone at Carnival.  (Ex. E, Pedersen, 162:4-21; 163:17-164:1).

32.     On the morning of February 14, 2013, before the TRIUMPH arrived in Mobile, Pedersen boarded her along with his boss (Martin Landtman) and three attorneys from the Fowler Rodriguez firm – Carnival's counsel in this matter.  (Ex. E, Pedersen, 45:22-47:12; 48:1-11; 164:2-12).   Carnival's in-house lawyers possibly boarded her as well.  (Ex. E, Pedersen, 47:1-23).[5]

33.     Pedersen spoke to Godfrey and Knepton numerous times as the TRIUMPH approached Mobile.  (Ex. E, Pedersen, 92:1-15).

34.     The TRIUMPH arrived in Mobile on the evening of February 14, 2013.  (Ex. E, Pedersen, 49:18-20).

35.     On the morning of February 15, 2013, the TRIUMPH was shifted from the Mobile Cruise Terminal to Pier K at BAE Shipyards.  (Ex. E, Pedersen, 174:1-10).   Upon arrival, Godfrey and Knepton met with Pedersen and other Carnival representatives onboard the TRIUMPH, and provided them hard copies of the contracts Godfrey had previously emailed to Pedersen on February 13.  (Ex. E, Pedersen, 173:20-174:17).

---

[5] Even onboard the TRIUMPH, Pedersen was able to forward emails to others at Carnival.  (Ex. R, Email).

36.     On February 17, 2013, Pedersen executed the Contract on behalf of Carnival.  (Ex. S, Contract; Ex. E, Pedersen, 169:17-19).  Pedersen was authorized by Carnival to execute the Contract.  (Ex. E, Pedersen, 171:9-12).

37.     The Contract contains the following limitation of liability clause:

LIMITATION OF LIABILITY:

(a)     We undertake to perform work on and dry dock vessels, and provide a berth, wharfage, towage and other services and facilities, only upon condition that we shall not be liable with respect to any one vessel, to its owners, and all other parties in interest, equipment or movable stores, for injury or damages, or for any consequence thereof, directly or indirectly, in contract, tort or otherwise, unless such injury or damage is caused by our negligence or the negligence of our employees.  Notwithstanding the foregoing, in no event shall our aggregate liability to the vessel and all such parties, including interest for injuries and damages sustained by them, exceed the portion of the contract price allocable to the equipment giving rise to the claim including the cost of installation at Company's yard provided further **in no event shall the Company's liability for all such instances connected with this transaction in aggregate exceed $1,000,000.00.**

(Ex. S, at 2 (emphasis added)).

38.     Pedersen read the Contract before he signed it.  (Ex. E, Pedersen, 170:5-7).  Pedersen acknowledges that he could have taken as much time as he wanted to read the Contract.  (Ex. E, Pedersen, 170:8-11).

39.     Pedersen believes he went through the Contract with others, including his boss Martin Landtman, on the bridge of the TRIUMPH.  (Ex. E, Pedersen,

170:19-171:8).  When Pedersen signed the Contract, Carnival's legal counsel in this matter was also present in Mobile.  (Ex. E, Pedersen, 337:11-19).

40.     Pedersen acknowledged that he signed the contract willingly, that he accepted the Contract's terms on behalf of Carnival, and that nobody forced him to accept the terms.  (Ex. E, Pedersen, 171:15-23).

41.     Pedersen never, at any point in time, raised any objection to signing the Contract.  (Ex. E, Pedersen, 165:12-15; 175:3-176:5).  Pedersen made no effort to try to revise, alter, or negotiate any of the terms of the Contract.  (Ex. E, Pedersen, 165:16-19).[6]

42.     Although Godfrey offered to "transition to a mutually agreed contract within the next few weeks," (Ex. Q, Email), Pedersen never attempted to negotiate a different contract, and is not aware of anyone from Carnival approaching BAE Shipyards to negotiate a different contract.  (Ex. E, Pedersen, 166:15-167:23).

43.     With regard to the TRIUMPH, Pedersen believes Godfrey was fair and honest in his dealings.  (Ex. E, Pedersen, 64:23-65:5).  Pedersen does not believe that Godfrey tried to take advantage of him or Carnival, nor does Pedersen believe that BAE Shipyards tried to take advantage of him or Carnival.  (Ex. E, Pedersen, 65:6-13).

---

[6] BAE Shipyards asked Carnival in interrogatories to "[i]dentify all persons involved in reviewing, negotiating, discussing and/or approving the Contract on behalf of Carnival."  (Ex. T, Interrogatory 5).  Carnival identified Pedersen, and only Pedersen.  (*Id.*)

44.     While the TRIUMPH was moored at BAE Shipyards, Carnival even considered having BAE Shipyards perform further work unrelated to the fire. (Ex. U, Email).

*The Breakaway.*

45.     From February 15 through April 3, 2013, the TRIUMPH was moored to Pier K at BAE Shipyards undergoing repair work. (Ex. E, Pedersen, 255:19-23). Although the repair work was performed at BAE Shipyards facility, Carnival engaged several of its regular contractors, including personnel from the shipyard that built the TRIUMPH, to perform a large percentage of the repair work. (Ex. N, Knepton, 106:11-107:10; Ex. E, Pedersen, 194:23-197:9). These contractors traveled from all over the country, and even the world, to come to Mobile for the TRIUMPH job. (Ex. N, Knepton, 106:11-107:10; Ex. E, Pedersen, 194:23-196:11). Because of this, the percentage of the repair work performed by BAE Shipyards as to the TRIUMPH was about 15-20% of the overall amount of the work. Carnival's other contractors and the TRIUMPH's crew performed the remaining 80-85% of the work. (Ex. N, Knepton, 106:23-107:10; Ex. E, Pedersen, 197:20-198:22).

46.     On April 3, 2013, Johnson and Ewing, in the course of their employment as Riggers, were assigned to work on three barges adjacent to the

TRIUMPH.  (Ex. B, ¶ 5; Ex. N, Knepton, 89:2-8).[7]  The barges were arranged as a staging area extending from Pier J to an access door on the side of the TRIUMPH. Johnson and Ewing worked with a forklift on the barges to move pallets of materials onto and off of the TRIUMPH in support of the repair work being performed on the vessel.[8]  (Ex. B, ¶ 5; Ex. N, Knepton, 89:2-8).

47.     At all pertinent times, the TRIUMPH and the adjacent three barges were located upon the navigable waters of the United States in the Mobile River, Mobile County, Alabama.  (Ex. B, ¶ 6).  At all pertinent times, the TRIUMPH and the three barges were actually in the water.  (*Id*.).

48.     Pier J was located entirely upon or within the navigable waters of the Mobile River.  (Ex. B, ¶ 7).  The pilings of Pier J extend down into the navigable waters, and the surface of Pier J is over the navigable waters.  (*Id*.).  Pier J adjoins the navigable waters where Johnson and Ewing were working on the barges.  (*Id*.). Pier J is customarily used by BAE Shipyards in support of its vessel repair work. (*Id*.).

49.     On April 3, 2013, the TRIUMPH broke free from her moorings during a storm referred to as a Wake Low.[9]  (Ex. E, Pedersen, 204:1-3).  The TRIUMPH

---

[7] For the Court's reference, a post-incident diagram of the TRIUMPH moored to Pier K is attached as Exhibit V. The diagram also depicts the three barges extending from Pier J adjacent to the TRIUMPH and adjoining the navigable waters.
[8] The materials could include pallets of floor tile, light fixtures, electrical cable, and even food for the crew.
[9] The parties dispute the cause of the TRIUMPH breaking free.

had been moored to Pier K for 48 days undergoing repairs before she broke free. (Ex. E, Pedersen, 255:19-256:2).

50.     At the time of the breakaway, Johnson and Ewing were on the water's end of Pier J.  (Ex. B, ¶ 8).  When the TRIUMPH broke away, it crashed into Pier J, knocking Johnson and Ewing into the water.  (*Id*.).  Johnson drowned, and Ewing claims to have sustained personal injuries.  (*Id*.).

51.     After the breakaway, from April 3 through May 8, 2013, further repair work on the TRIUMPH was performed at the Mobile Cruise Terminal.  (Ex. E, Pedersen, 120:3-7).   However, even after the breakaway incident, Carnival discussed moving the TRIUMPH back to a pier at BAE Shipyards for repairs.  (Ex. E, Pedersen, 211:7-212:14).  Similarly, to date, Pedersen's colleagues at Carnival continue to work with BAE Shipyards in San Francisco and have plans to continue dry-docking ships there.  (Ex. E, Pedersen, 219:4-220:18).

### *The Litigation.*

52.     Bernadette Johnson, as the personal representative of the estate of John R. "Buster" Johnson, and Ewing filed suit against Carnival for, respectively, damages resulting from the death of Johnson and the alleged personal injuries to Ewing arising out of the breakaway of the TRIUMPH.  (*Johnson, et al. v. Carnival Corporation, et al.*, United States District Court for the Southern District of Alabama, Civil Action No. 13-0330-CG-C).

53.     Carnival filed this lawsuit separately against BAE Shipyards and others.  *(Carnival Corp. v. BAE Systems SSY Alabama Property Holdings, LLC et al.* Civil Action No.: CA-13-0314-CG-C).   In this lawsuit, Carnival seeks to recover an amount in excess of $12,000,000 for damages allegedly sustained as a result of the TRIUMPH breakaway incident.   Carnival also has asserted claims against BAE Shipyards for indemnity and/or contribution in response to Johnson's and Ewing's claims for damages.  (Docs. 1 and 74, at 11).[10]

54.     As a result of Johnson's death, BAE Shipyards has paid, and continues to pay, benefits to Johnson's family members pursuant to the LHWCA. (Ex. A, ¶ 9; Doc. 110, ¶¶ 13, 31).[11]   BAE Shipyards also has paid benefits under the LHWCA to and for Ewing.  (Ex. A, ¶ 9; Doc. 110, ¶¶ 14, 31).

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   The mere existence of some alleged factual dispute is not sufficient to defeat a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir.2004).  "A court need not

---

[10] The Johnson and Ewing lawsuit, the Carnival lawsuit, and a third lawsuit filed by the United States of America have been consolidated for purposes of pretrial management and discovery.  (Doc. 57).

[11] Carnival admitted in it is Answer to BAE Shipyards' Second Amended Counterclaim that BAE Shipyards paid LHWCA benefits as a result of Johnson's death and Ewing's alleged injuries.  (Doc. 110, ¶¶ 13-14, 31).

permit a case to go to a jury, [ ] when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir.2002) (citations omitted). Additionally, a moving party is entitled to summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## LEGAL ANALYSIS

### I.    The limitation of liability clause in the Contract limits BAE Shipyards' liability to Carnival to $1 million.

Substantive admiralty law controls the analysis of a limitation of liability clause in a vessel repair contract. *Diesel "Repower", Inc. v. Islander Investments Ltd.*, 271 F.3d 1318, 1325 (11th Cir. 2001). "Parties to a contract for the repair of a vessel may validly agree to limit the repairer's liability." *Id.* at 1324. "The rationale underlying limitation on liability clauses is that businessmen can bargain the limitation during negotiations and set their ultimate price accordingly." *Id*. A limitation of liability clause is enforceable if it satisfies a three-prong test:

> First, the limited liability clause must clearly and unequivocally indicate the parties' intention. Second, the limitation must not absolve the repairer of all liability and must still provide a deterrent to negligence. Third, the parties to the contract must have equal bargaining power.

*Merrill Stevens Dry Dock Co. v. M/V Yeocomico II*, 329 F.3d 809, 813 (11th Cir. 2003) (internal punctuation and citations omitted). The following paragraphs demonstrate that the BAE Shipyards-Carnival contract meets these three prongs.

**A.** **The limitation of liability clause clearly and unequivocally indicates the parties' intention.**

The Court must first consider whether the limitation of liability clause clearly and unequivocally indicates the parties' intention, *i.e.*, whether the contract is ambiguous. *Id*. The question whether a contract is ambiguous is one of law for the Court to determine. *Id*. at 814. "In making that determination, a contractual provision should not be construed as being in conflict with another unless no other reasonable interpretation is possible. . . . Therefore, an ambiguity is not invariably present when a contract requires interpretation." *Id*. (internal quotations omitted).

The relevant language in the Contract provides:

LIMITATION OF LIABILITY:

(a)    We undertake to perform work on and dry dock vessels, and provide a berth, wharfage, towage and other services and facilities, only upon condition that we shall not be liable with respect to any one vessel, to its owners, and all other parties in interest, equipment or movable stores, for injury or damages, or for any consequence thereof, directly or indirectly, in contract, tort or otherwise, unless such injury or damage is caused by our negligence or the negligence of our employees. Notwithstanding the foregoing, in no event shall our aggregate liability to the vessel and all such parties, including interest for injuries and damages sustained by them, exceed the portion of the contract price allocable to the equipment giving rise to the claim including the cost of installation at Company's yard provided further **in no event shall the Company's liability for all**

> **such instances connected with this transaction in aggregate exceed $1,000,000.00.**

Ex. S, at 2 (emphasis added).  This contractual language is clear and unequivocal that BAE Shipyards' liability to Carnival cannot exceed $1 million.

### B. <u>The limitation does not absolve BAE Shipyards of all liability and still provides a deterrent to negligence.</u>

The Contract does not absolve BAE Shipyards of all liability and still provides a deterrent to negligence.  The Eleventh Circuit has previously "held that a risk of liability for as little as $300,000 is a sufficient deterrence of negligence." *Merrill*, 329 F.3d at 814.  In fact, the Eleventh Circuit expressly held that a liability risk of up to $1 million for potential negligence "**easily satisfie[s]**" this prong of the test.  *Id.*  (emphasis added).  For this reason, the limitation of liability of up to $1 million pursuant to the Contract satisfies the second prong of the test for enforceability.

### C. <u>The parties to the Contract have equal bargaining power.</u>

As a matter of law, Carnival and BAE Shipyards have equal bargaining power.  In *Merrill Stevens*, the Eleventh Circuit found equal bargaining power where the individual executing the repair contract "had been conducting business in the ship repair industry for over forty years, and had executed similar repair contracts in the past with [the shipyard] and with his own clients when he previously owned a shipyard." *Merrill Stevens*, 329 F.3d at 814 n.4.  Likewise, the

Eleventh Circuit has found equal bargaining power where the facts indicated "sophistication as a businessman and [] familiarity with the marine industry." *Diesel*, 271 F.3d at 1325.  As the following paragraphs will demonstrate, Carnival had equal bargaining power with BAE Shipyards.

Carnival is a global cruise company, which owns approximately 102 ships around the world.  (Ex. E, Pedersen, 29:19-30:1; Exs. F and G, Carnival website; Ex. H, Gigliotti, 309:5-310:20).  Carnival has its ships repaired and serviced in shipyards around the world.  (Ex. E, Pedersen, 52:21-53:4).  Carnival regularly reviews and negotiates contracts with shipyards.  (Ex. E, Pedersen, 54:2-17).  Carnival's need for shipyards to perform repairs and services will continue into the future as long as Carnival owns ships.  (Ex. E, Pedersen, 55:12-16).

Carnival has worked with BAE Shipyards in Mobile in the past, and the companies have "had a long-standing business relationship."  (Ex. E, Pedersen, 58:11-16; 61:12-16; 63:3-5).  Pedersen personally knew people at BAE Shipyards, including Godfrey, "for quite some time."  (Ex. E, Pedersen, 61:21-62:4; 63:20-23; 74:15-19).  Godfrey would come to see Pedersen in the office, contact him many times, and see Pedersen at least once a year at the Sea Trade in Miami.  (Ex. E, Pedersen, 63:20-64:5).  Pedersen has Godfrey's cell number and office number in his contacts.  (Ex. E, Pedersen, 111:4-10).

Based on their dealings, Pedersen considers Godfrey and Knepton of BAE Shipyards to be honest, trustworthy, and "the type of [people Pedersen] would like to deal with again in the future."  (Ex. E, Pedersen, 63:20-5; 64:18-22, 102:2-16). Pedersen does not believe that Godfrey tried to take advantage of him or Carnival, nor does Pedersen believe that BAE Shipyards tried to take advantage of him or Carnival.  (Ex. E, Pedersen, 65:6-13).

BAE Shipyards asked Carnival to send a proposed contract on at least two occasions, but Carnival never sent a proposed contract to BAE Shipyards.  (Exs. O and P, Emails; Ex. E, Pedersen, 131:20-132:4; 133:5-8; 137:8-12; 156:1-14). When BAE Shipyards emailed its proposed contracts to Carnival, BAE Shipyards offered to transition to a different contract in the future if Carnival so desired.  (Ex. Q, Email).  Pedersen never, at any point in time, raised any objection to signing the Contract.  (Ex. E, Pedersen, 165:12-15; 175:3-176:5).  Pedersen made no effort to try to revise, alter, or negotiate any of the terms of the Contract.  (Ex. E, Pedersen, 165:16-19).  Pedersen is not aware of anyone from Carnival approaching BAE Shipyards to negotiate a different contract.  (Ex. E, Pedersen, 166:15-167:23). Pedersen acknowledged that he could have sent the email with the Contract (or had it sent on his behalf) to anyone at Carnival.  (Ex. E, Pedersen, 162:4-21; 163:17-164:1).

Carnival has legal departments with in-house lawyers.  (Ex. E, Pedersen, 43:7-44:4; Ex. H, Gigliotti, 311:17-312:5).  Carnival employees, like Pedersen, have access to the legal departments for advice and support as necessary in performing their work.  (Ex. E, Pedersen, 43:21-44:15).  Carnival also has outside counsel to assist in legal matters.  (Ex. E, Pedersen, 44:16-45:12).  If there is something in a ship repair contract that is beyond Pedersen's scope of experience or expertise, then he would call upon either his supervisors or the in-house lawyers for Carnival.  (Ex. E, Pedersen, 56:17-21).  Those are resources that Pedersen has "available to [him] at all times."  (Ex. E, Pedersen, 56:22-57:1).  If Pedersen receives a contract that he is uncertain about, he has "a team of lawyers from Carnival who could review it for [him] and provide [him] with advice."  (Ex. E, Pedersen, 57:2-8).  All he "had to do was ask them."  (Ex. E, Pedersen, 57:9-11).

Pedersen read the Contract before he signed it.  (Ex. E, Pedersen, 170:5-7).  Pedersen acknowledged that he could have taken as much time as he wanted to read the Contract.  (Ex. E, Pedersen, 170:8-11).  Pedersen acknowledged that he signed the contract willingly, that he accepted the Contract's terms on behalf of Carnival, and that nobody forced him to accept the terms.  (Ex. E, Pedersen, 171:15-23).  Pedersen believes he went through the Contract with others, including his boss Martin Landtman, on the bridge of the TRIUMPH.  (Ex. E, Pedersen, 170:19-171:8).  When Pedersen signed the Contract, Carnival's counsel in this

matter was also present in Mobile.  (Ex. E, Pedersen, 337:11-19; 45:22-47:12; 48:1-11; 164:2-12).

Finally, the repair work could have been performed at two other piers in Mobile, including the Mobile Cruise Terminal and one of the piers at the Alabama State Docks.  Moreover, the amount of the repair work that BAE Shipyards performed compared to the amount of repair work performed by Carnival's regular contractors who traveled from around the globe for the TRIUMPH job, was small. Indeed, BAE Shipyards performed 15-20% of the repair work, while these other contractors, along with the TRIUMPH's crew, performed 80-85%.

Based on the foregoing, BAE Shipyards is entitled to partial summary judgment as to the enforceability of the limitation of liability clause in the Contract, which limits BAE Shipyards' liability to Carnival to $1 million.

## II.   Section 905(b) of the Act bars all claims by vessels for indemnity or contribution against an employer of a maritime employee.

BAE Shipyards is also entitled to partial summary judgment pursuant to the Act as to Carnival's claims for indemnification and contribution relating to the death of Johnson and the alleged personal injuries of Ewing.  The Act allows maritime employees to recover compensation from their employers for certain injuries "irrespective of fault as a cause for the injury."  33 U.S.C. § 904(b). Because the employer is subject to liability to compensate the employee regardless

of fault, the Act, by its express terms, makes this recovery the "exclusive" liability of an employer:

> The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee . . . and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury.

33 U.S.C. § 905(a).

Although maritime employees are statutorily barred from suing their employer, the Act allows the maritime employee to pursue a separate action against the "vessel" if its negligence caused the injury:  "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party . . . ."  33 U.S.C. § 905(b). Thus, vessels are liable in negligence to maritime employees injured by the vessel.

Because an employer is liable to the maritime employee regardless of fault, the Act immunizes the employer from suits for contribution or indemnity by the vessel.  *In re Natures Way Marine, LLC*, 984 F. Supp. 2d 1231, 1236-1237 (S.D. Ala. Nov. 25, 2013).  The Act expressly provides that where an injured employee brings an action against a vessel for damages, "the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void."  33 U.S.C. § 905(b).  As the Supreme Court has stated, "§ 905 permits the injured longshoreman to sue the vessel and exempts the

employer from any liability to the vessel for any damages that may be recovered."
*Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 268 (1979).
"[T]he 1972 Amendments make quite clear that 'the employer shall not be liable to
the vessel for such damages *directly or indirectly*.'"   *Id*. at 270 (emphasis in
original); *see also Pippen v. Shell Oil Co.*, 661 F.2d 378, 386 (5th Cir. 1981)
(stating that § 905(b) "expressly forbids an action by the vessel against the
employer for damages for an injury caused by the negligence of the vessel"); *In re
Knudsen*, 710 F. Supp. 2d 1252, 1268 n.9 (S.D. Ala. 2010) (stating that "§ 905(b)
explicitly prohibits indemnity action by vessels against an employer and does not
differentiate between contractual or tort indemnity").   "[A] principal purpose [of
the 1972 amendments] was to free maritime employers of indemnity claims by
vessels on which their employees were injured, and thus to assure that an
employer's compensation liability under the Act 'shall be exclusive and in place of
all other liability' for an employment-related injury. . . .   The express legislative
intent was to immunize employers of amphibious workers injured on a vessel from
indemnity claims. . . ."   *Boudreaux v. American Workover, Inc.*, 680 F.2d 1034,
1052 (5th Cir. 1982).   Thus, it is well-settled that "under the Act, the employer is
immune to suit for indemnity or contribution by the vessel."   *Samuels v. Empresa
Lineas Maritimas Argentinas*, 573 F.2d 884, 888 (5th Cir. 1978); *Pippen*, 661 F.2d

at 385 ("Section 905(b) of the [Act] cuts off the right of a vessel . . . to recover contribution or indemnity from the employer.").

The following paragraphs will demonstrate (1) that Johnson and Ewing are "employees" pursuant to the Act, (2) that BAE Shipyards is a statutory "employer," and (3) that Carnival is a "vessel."  For these reasons, the claims by Carnival, which seek contribution and indemnity from BAE Shipyards relating to the death of Johnson and the alleged injuries to Ewing, are prohibited as a matter of law by § 905(b) of the Act.

### A. Johnson and Ewing are "employees" pursuant to the Act.

To be a statutory employee: (1) the person must be injured in the course of employment; (2) the employer must have employees engaging in maritime employment; (3) the injured person must have "status," that is, be engaged in maritime employment; and (4) the injury must occur "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel.)"  *Natures Way*, 984 F. Supp. 2d 1231, 1237-1238 (citing §§ 902 and 903 of the Act).  The following paragraphs will address these elements in turn.

First, Johnson was killed and Ewing was injured "in the course of [their] employment" and were not merely "transiently and fortuitously" on the barges and

the adjoining Pier J.  *Id.*  Johnson and Ewing were employed as Riggers, worked in the shipyard, and performed tasks associated with, among other things, repairing and servicing ships.  (Ex. B, ¶ 4).  On the day of the breakaway incident, Johnson and Ewing were working on the barges on navigable waters, using a forklift to move pallets of materials onto and off of the TRIUMPH, all in support of the repair work being performed to the vessel.  (Ex. B, ¶ 5).  At the time of the breakaway, Johnson and Ewing were on the water's end of Pier J, which adjoins the navigable waters where they were working on the barges.  (Ex. B, ¶ 7).  When the TRIUMPH broke away, it crashed into Pier J, knocking Johnson and Ewing into the water.  (Ex. B, ¶ 8).  Johnson's and Ewing's presence aboard the barges and the adjoining Pier J was neither transient nor fortuitous but was the very purpose of their employment.  Hence, Johnson and Ewing were acting "in the course of [their] employment" when they performed the above-described work on the barges on actual navigable waters and the adjoining pier.  *Bienvenu v. Texaco, Inc.,* 164 F.3d 901, 906-908 (5th Cir. 1999).

Second, Johnson's and Ewing's employer, BAE Shipyards, has employees engaging in maritime employment.  *Natures Way*, 984 F. Supp. 2d 1231, 1239.  BAE Shipyards employs approximately 540 workers.  (Ex. A, ¶ 5).  Approximately 400 workers are directly engaged in longshore positions in the shipyard performing ship repair work and the construction of new vessels.  (*Id.*).

Third, Johnson and Ewing were engaged in maritime employment because they were employed as Riggers for BAE Shipyards.  The Act protects those employees engaged in "maritime employment, including any longshoreman . . . and any harbor-worker **including a ship repairman**. . . ."  33 U.S.C. § 902(3).  On the day of the incident, Johnson and Ewing were working with a forklift on the barges on navigable waters to move pallets of materials onto and off of the TRIUMPH in support of the repair work being performed to the vessel.[12] (Ex. B, ¶ 5).  Thus, because of their involvement in working as riggers to support the repair work provided to the TRIUMPH, Johnson and Ewing qualify as statutory employees engaged in maritime employment.[13]

Fourth, the death of Johnson and the alleged injuries to Ewing  occurred "**upon the navigable waters** of the United States (**including any adjoining pier**, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel.)"  33 U.S.C. § 903(a) (emphasis added).  As stated previously, on the day of the incident, Johnson and Ewing were working with a forklift on

---

[12] Assisting in unloading a vessel is also considered maritime employment.  *See, e.g., Natures Way*, 984 F. Supp. 2d 1231, 1239 (worker hired to assist in unloading rainwater/wastewater from a barge was engaged in maritime employment); *Browning v. B.F. Diamond Const. Co.*, 676 F.2d 547, 549 (11th Cir. 1982) (stating that traditional longshoring activities like loading/unloading a vessel are maritime employment); *Gilliam v. Wiley N. Jackson Co.*, 659 F.2d 54, 58 (5th Cir. 1981) (person unloading cargo of pilings from a barge is a statutory employee).

[13] BAE Shipyards maintains that Johnson's and Ewing's work is sufficient to trigger coverage of the Act.  However, to the extent any additional evidence of their status might be necessary, Johnson's widow and his estate and Ewing filed claims against BAE Shipyards for benefits under the Act and have been paid benefits on those claims.  (Ex. A, ¶ 9).

barges on navigable waters to move pallets of material onto and off of the TRIUMPH as part of the repair operation.  At the time of the incident, they were on the water's end of the adjoining Pier J, when the TRIUMPH crashed into Pier J, knocking Johnson and Ewing into the water.[14]

### B. BAE Shipyards is an "employer" pursuant to the Act.

BAE Shipyards is an "employer" pursuant to the Act.[15]  "[W]hen an injured worker meets the employee definition, his employer automatically qualifies as a statutory employer under Section 902(4)."  *Natures Way*, 984 F. Supp. 2d 1231, 1239.  BAE Shipyards employed Johnson and Ewing.  (Ex. A, ¶ 7).  As demonstrated above, Johnson and Ewing were statutory employees.  Because BAE Shipyards' employees, Johnson and Ewing, were statutory employees, BAE Shipyards "automatically qualifies as a statutory employer under Section 902(4)" of the Act.  *Natures Way*, 984 F. Supp. 2d 1231, *7.[16]

---

[14] Pier J was located entirely upon or within the navigable waters of the Mobile River.  (Ex. B, ¶ 7).  The pilings of Pier J extend down into the navigable waters, and the surface of Pier J is over the navigable waters.  (*Id.*).  Pier J is customarily used by BAE Shipyards in support of its vessel repair work. (*Id.*).

[15] "The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)."  33 U.S.C. § 902(4).

[16] To the extent that any additional evidence might be required to establish BAE Shipyards' status as a statutory "employer," BAE Shipyards employs approximately 540 workers.  (Ex. A, ¶ 5).  Approximately 400 workers are directly engaged in longshore positions in the shipyard,  performing ship repair work and  the construction of new vessels.  (Ex. A, ¶ 5). Additionally, BAE Shipyards maintains LHWCA insurance coverage and has paid claims to Johnson and Ewing for benefits pursuant to the Act.  (Ex. A, ¶¶ 6, 9).

### C. Carnival is a "vessel" pursuant to the Act.

Carnival is a "vessel" pursuant to the Act.  The term "vessel," as defined in the Act, is not limited to the vessel itself but extends to the "vessel's **owner**, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member."  33 U.S.C. § 902(21) (emphasis added); *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 489 n.2 (2005) (stating that § 902(21) "lists the parties liable for the negligent operation of a vessel").  Carnival has admitted that it is the owner of the TRIUMPH.  (Docs. 1, ¶ 4; 75).  Thus, Carnival – as the owner of the TRIUMPH – is a "vessel" pursuant to the Act.

### D. Section 905(b) of the Act bars all claims by Carnival against BAE Shipyards for indemnity or contribution relating to the death of Johnson and the alleged injuries to Ewing.

Carnival is a vessel attempting to recover indemnity or contribution from a statutory employer, BAE Shipyards, for damages relating to claims made against Carnival by Johnson's estate and Ewing.  (Docs. 1 and 74, at 11).  The Act flatly prohibits such indemnity/contribution claims whether made "directly or indirectly" and states that "any agreements or warranties to the contrary shall be void."  33 U.S.C. § 905(b).  As established above, courts universally dismiss claims for indemnity or contribution made by vessels (like Carnival) against employers (like BAE Shipyards), regardless of whether those claims seek damages directly or indirectly in contract or tort.  *See Knudsen*, 710 F. Supp. 2d at 1268 n.9 (stating

that "§ 905(b) explicitly prohibits indemnity action by vessels against an employer and does not differentiate between contractual or tort indemnity").

As a matter of law, Carnival's claims for indemnity or contribution related to the death of Johnson and the alleged personal injuries to Ewing should be summarily dismissed.

## CONCLUSION

Based on the foregoing, BAE Shipyards is entitled to partial summary judgment on the following grounds: (1) The limitation of liability clause in the Contract is enforceable, such that the liability of BAE Shipyards to Carnival, if any, is limited to $1 million; and (2) BAE Shipyards is immune pursuant to the Act to Carnival's claims for indemnification and contribution relating to the death of Johnson and the alleged injuries to Ewing, both of whom were BAE Shipyards' employees.  As to these two grounds, there is no genuine issue of material fact, and BAE Shipyards is entitled to judgment as a matter of law.

Respectfully submitted,

*/s/ Brian P. McCarthy*
BRIAN P. MCCARTHY (MCCAB7434)
bmccarthy@mcdowellknight.com
S. FRASER REID, III (REIDS7483)
freid@mcdowellknight.com
Attorneys for BAE SYSTEMS SOUTHEAST
SHIPYARDS ALABAMA LLC

OF COUNSEL:

MCDOWELL KNIGHT ROEDDER
  & SLEDGE, LLC
11 North Water St., Ste. 13290
Mobile, Alabama  36602
(251) 432-5300
(251) 432-5303 (fax)

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2014, I filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will notice to all counsel of record.

Mary Campbell Broughton
FOWLER RODRIGUEZ
Post Office Box 40008
Mobile, Alabama 36640
Attorney for Carnival Corporation

Antonio J. Rodriguez
George J. Fowler, III
A. T. Chenault
Michael A. Harowski
FOWLER RODRIGUEZ
400 Poydras Street, 30th Floor
New Orleans, Louisiana 70130
Attorneys for Carnival Corporation

David A. Bagwell
Post Office Box 2126
Fairhope, Alabama 36533
Attorney for Bernadette Johnson and Jason Ewing

George W. Finkbohner, III
Toby D. Brown
David G. Wirtes
CUNNINGHAM BOUNDS
Post Office Box 66705
Mobile, Alabama 36660
Attorneys for Defendants Bernadette Johnson and Jason Ewing

A. Danner Frazer, Jr.
Michael Upchurch
Mary Margaret Bailey
Jay N. Robinson
FRAZER GREENE UPCHURCH & BAKER, LLC

35

P. O. Box 1686
Mobile, Alabama 36633
Attorneys for Defendant BAE Systems SSY Alabama Property Holdings,
LLC

Norman M. Stockman
Paul T. Beckmann
HAND ARENDALL LLC
Post Office Box 123
Mobile, AL 36601
Attorneys for Signal Ship Repair, LLC

Michael A. Dilauro
Benjamin R. Sweeney
Trial Attorneys
Aviation & Admiralty Litigation
Torts Branch, Civil Division
U.S. Department of Justice
P. O. Box 14271
Washington, DC 20044-4271
Attorneys for the United States Army Corp of Engineers

*/s/ Brian P. McCarthy*